**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| _____ | : | |
| ROBERT JOHNSTON | : | CIVIL ACTION |
| 4719 Aubrey Avenue | : | |
| Philadelphia, PA 19114 | : | |
| | : | |
| JACK ZUBRIS | : | |
| 92 Grant Drive | : | |
| Holland, PA 18966 | : | |
| | : | |
| EDWARD PILOSI | : | |
| 716 Yale Road | : | |
| Bala Cynwyd, PA 19004 | : | |
| | : | |
| And | : | |
| | : | |
| PETER BRACCHI | : | |
| 734 Hill Road | : | |
| Philadelphia, PA 19128 | : | |
| | : | NO. |
| v. | : | |
| | : | |
| SCHOOL DISTRICT OF PHILADELPHIA | : | |
| Administration Building | : | |
| 21st Street and Ben Franklin Parkway | : | |
| Philadelphia, PA 19103 | : | **JURY TRIAL DEMANDED** |
| | : | |
| And | : | |
| | : | |
| KIMBERLY SANGSTER, | : | |
| In her individual and official capacities, | : | |
| Chief Procurement Officer | : | |
| School District of Philadelphia | : | |
| John F. Kennedy Center | : | |
| 734 Schuylkill Avenue, Room 120 | : | |
| Philadelphia, PA 19146 | : | |
| _____ | | |

## <u>COMPLAINT</u>

1.      Plaintiffs Robert Johnston, Jack Zubris, Edward Pilosi and Peter Bracchi

("Plaintiffs") are current and former employees of the School District of Philadelphia ("the

School District") who were supervised, either directly or indirectly, by Ms. Kimberly Sangster ("Ms. Sangster") (the School District and Ms. Sangster are collectively referred to herein as "Defendants").  Defendants discriminated against Plaintiffs by terminating their employment with the School District because of their race (Caucasian/White).  Defendants then retaliated against Plaintiffs for objecting to and complaining about Defendants' discriminatory practices.

2.       Plaintiffs now bring this action under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-1 et seq., the Civil Rights Act of 1866, 42 U.S.C. § 1981, and the Pennsylvania Human Relations Act, 43 Pa. C.S. § 951 et seq.

<u>**PARTIES**</u>

3.       Plaintiff Robert Johnston resides at 4719 Aubrey Avenue, Philadelphia, PA 19114.  Mr. Johnston has worked at the School District since 1989 (15 years), rising from Buyer II to Supervisor/Inventory Control Specialist, to Director of Materials Management, before Defendants terminated his employment in February of 2003 (and later reinstated him at a much lower position and salary).  Prior to the acts of discrimination and retaliation set forth here, Mr. Johnston had an unblemished record of service and success at the School District, and had been widely praised by those inside and outside the School District as a fair and superior manager who led an efficient and successful procurement/purchasing department.

4.       Plaintiff Jack Zubris resides at 92 Grant Drive, Holland, PA  18966.  Mr. Zubris worked at the School District for more than 29 years, starting as a Buyer I, and earning promotions to Technical Service Supervisor and Procurement Technical Services Managers.  Prior to the acts of discrimination and retaliation set forth here, Mr. Zubris had an unblemished record of service and success at the School District, and had received outstanding performance reviews and feedback from those inside and outside the School District.

5.      Plaintiff Edward Pilosi resides at 716 Yale Road, Bala Cynwyd, PA 19004.  Mr.

Pilosi worked at the School District from 1970 until February of 2003, when Defendants

terminated his employment.  Mr. Pilosi began his career at the School District as a Buyer I, and

over the course of his 33 years of dedicated service to the School District earned promotions to

Technical Services Specification Writer, Buyer II, Purchasing Supervisor and Purchasing

Services Manager.  Prior to the acts of discrimination and retaliation set forth here, Mr. Pilosi

had an unblemished record of service and success at the School District, and had received

outstanding performance reviews and feedback from those inside and outside the School District.

6.      Plaintiff Peter Bracchi resides at 734 Hill Road, Philadelphia, PA 19128.  Mr.

Bracchi worked at the School District from 1986 until February 3, 2003, when Defendants

terminated his employment.  Mr. Bracchi worked as a Food Services Purchasing Specification

Specialist, Contract Compliance Officer and Procurement Administrative Coordinator during his

17 years of employment with the School District.  Prior to the acts of discrimination and

retaliation set forth here, Mr. Bracchi had an unblemished record of service and success at the

School District, and had received outstanding performance reviews and feedback from those

inside and outside the School District.

7.      The School District is a home rule school district established under the

Philadelphia Home Rule Charter.

8.      At all relevant times, the School District maintained and regularly conducted

business from its offices located at The John F. Kennedy Center, 734 Schuylkill Avenue,

Philadelphia, PA 19146.

9.      The School District is an instrumentality of the City of Philadelphia, and the Office of the Mayor of the City of Philadelphia is involved in appointing Board members and other top officials of the School District.

10.     Ms. Sangster, an African-American female, resides at 4000 Presidential Boulevard, No. 1105, Philadelphia, PA 19131, and is a citizen of the Commonwealth of Pennsylvania.

11.     From November 2002 to the present, Ms. Sangster has held the position of Chief Procurement Officer of the School District.  Ms. Sangster made and/or participated in the decision to terminate Plaintiffs' employment with the School District because of their race (Caucasian/White) and without offering them the opportunity to transfer into a comparable position instead of being terminated (as other non-Caucasian employees were).  She also made and/or participated in the decision to retaliate against Plaintiffs because they challenged Defendants' discriminatory practices.

12.     Plaintiffs are all Caucasian males, current and/or former employees of the School District and citizens of the Commonwealth of Pennsylvania.

**PLAINTIFFS EXHAUSTED THEIR ADMINISTRATIVE REMEDIES**

13.     On July 31, 2003, Plaintiffs timely filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC"), which was dual filed as a Complaint of Discrimination with the Pennsylvania Human Relations Commission ("PHRC").

14.     On August 26, 2003, Plaintiffs filed a supplement to their original Charge/Complaint of Discrimination to address unlawful discrimination and retaliation Defendants took against Mr. Johnston in the month following Plaintiffs original Charge/Complaint of Discrimination.

15.     On July 30, 2004 and August 2, 2004, Plaintiffs received Notice of Right to Sue Letters advising them of their right to initiate this action against Defendants.

16.     Plaintiffs have timely filed this action within 90 days following receipt of their Notice of Right to Sue Letters.

## JURISDICTION

17.     The Court has subject matter jurisdiction over Plaintiffs' race discrimination and retaliation claims under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e-2 et seq., the Civil Rights Act of 1866, 42 U.S.C. § 1981, and the Civil Rights Act of 1870, 42 U.S.C. § 1983, pursuant to 28 U.S.C. § 1331.  This Court has supplemental jurisdiction over Plaintiffs' PHRA claims pursuant to 28 U.S.C. § 1367.

## VENUE

18.     Venue is appropriate in this District pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to Plaintiffs' claims occurred in this District and Defendants both reside in this District.

## BACKGROUND

19.     The School District had as one of its departments the Purchasing Department, which is now called the Office of Procurement Services ("the Department").

20.     From 1997 until February of 2003, Mr. Johnston served as Director of Materials Management, which included the Department.  Among other things, Mr. Johnston headed the Department.

21.     Also managers in the Department, reporting to Mr. Johnston, were: (1) Mr. Zubris, who was the Procurement Technical/Customer Service Manager in the Department; (2) Mr. Pilosi, who was the Purchasing Services Manager in the Department; and (3) Mr. Bracchi, who was the Procurement Administrative Coordinator in the Department.

22.     Simply stated, Plaintiffs were the supervisory employees who managed the Department on a day-to-day basis.

23.     During the six years leading up to February of 2003, the Department had been recognized inside and outside of the School District as an efficient, friendly, fair and superior department within the School District.  For example, an independent study of the School District determined that the Department was one of the School District's best-performing units and should be expanded.

**School District Hired Ms. Sangster; She Saw "Too Many White Managers"**

24.     On or about November 4, 2002, Ms. Sangster began to work for the School District as the new Chief Procurement Officer.  In that position, she oversaw the activities of the Department, supervised Mr. Johnston directly, and supervised each other Plaintiff in a less direct way.

25.     Ms. Sangster is an African-American female.  In her new position, Ms. Sangster reported to Ms. Natalye Paquin (also an African-American female) and Ms. Paquin reported directly to Mr. Paul Vallas, the CEO of the School District.

26.     Upon information and belief, before joining the School District, Ms. Sangster's total purchasing experience amounted to four years in the Chicago public school system.  She was arguably less qualified for her position at the School District than each of the Plaintiffs - who each had from 15 to 33 years of purchasing experience.

27.     On or about her first day on the job in November of 2002, Ms. Sangster asked Mr. Johnston if he was "going to have a hard time working for a black woman," or words to that effect.  Mr. Johnston had not said or done anything to prompt this racist remark, and responded that he would not have a difficult time working for her.  Mr. Johnston would not and has not had any difficulty in working for any qualified supervisor, regardless of race or gender.

28.     Later in November 2002, Ms. Sangster stated to Mr. Johnston that, "There are too many white male managers in this department," or words to that effect.  Mr. Johnston was stunned by this blatantly racist comment, and immediately reported it to others.

29.      In January 2003, Ms. Sangster provided further insight into her views of managers and supervisory practices when she told Mr. Johnston: "Caucasian managers' offices are too big.  I'm going to do something about it", or words to that effect.

30.     During the initial months in her new position, Ms. Sangster repeatedly communicated her feelings about Plaintiffs in non-verbal ways as well.  She would refuse to greet or say "hello" to Plaintiffs or make eye contact with them, except when necessary to conduct business.  In sharp contrast, she would go out of her way to warmly greet many of the Department's African-American employees and engage them in conversation.

### Ms. Sangster Favored African-Americans, Disfavored Whites

31.     Immediately after Ms. Sangster arrived at the School District, she asked certain African-American workers in the Department whether they wanted promotions.

32.     In early 2003, prior to the time she terminated Plaintiffs, Ms. Sangster initiated a promotion for an African-American female from her secretarial position to the position of Materials Management Specialist in the Department.

33.     Ms. Sangster did not give any other employees the opportunity to apply for this new position.  Instead, contrary to School District policy, she handpicked the employee for that position.

34.     In another example, Ms. Sangster asked an African-American male employee if he wanted to move from his position as a specification assistant to the position of Buyer I.

35.     Only African-American employees were asked if they wanted promotions.  In addition, Ms. Sangster has moved African-American employees into bigger and more prominent

offices, while relegating White employees to less desirable and more out of the way office and desk locations.

36.     Ms. Sangster and the School District also began an aggressive effort to direct School District and Department purchases to minority-owned, and especially African-American-owned businesses, even when those efforts cost the School District more money and unfairly excluded non-minority businesses.

37.     The Department had always promoted and encouraged the use of minority-owned businesses, and had great success doing so, but only to the extent allowed by law.  In contrast, Ms. Sangster began mandating that certain purchases be directed to minority-owned contractors, in violation of the law.

38.     Ms. Sangster's conduct with regard to the unequal treatment based on race was pursuant to a custom, policy, pattern and practice of the School District, and approved and supported at the highest levels of the School District and the City of Philadelphia.

39.     Defendants knowingly and willfully violated the law in this regard.

**Defendants Summarily Terminated Plaintiffs, Without Explanation**

40.     On or about February 3, 2003, Ms. Sangster, without prior notice, warning, counseling or cause, informed Mr. Johnston that he was terminated from his position as Director of Materials Management in the Department.

41.     The other Plaintiffs were notified of their terminations on or about the same day. Plaintiffs were told they were being terminated as part of a cost-cutting reorganization of the Department.  However, no African-American employees were terminated at the time as part of this alleged cost-cutting measure.  Defendants terminated Plaintiffs because of their race, pursuant to a custom, policy and practice of the School District.

42.     Defendants' claim that this was a cost-saving move was false and pretextual.  The reorganized Department under Ms. Sangster was larger and had a higher payroll than the Department did before the reorganization.

43.     Moreover, Ms. Sangster had destroyed her credibility in claiming any concern about costs when, after arriving to work at the School District, she ordered more than $14,000 in new furnishings for her personal office, all paid for by taxpayer money.

**<u>Plaintiffs Were and Still Are Qualified.</u>**

44.     Plaintiffs were fully qualified for their pre-February 2, 2003 positions just as they were qualified for each position for which they applied (or could have received by way of a transfer) after that date.

45.     Each Plaintiff is a college graduate and has a distinguished career of service to the School District.  Moreover, Plaintiffs hold numerous Certificates of Achievement, letters of commendation and letters of appreciation for outstanding performance as well as Departmental Employee of the Year awards and/or nominations from the School District.

46.     In addition, Plaintiffs have earned over 90 years of collective experience with the School District, and, during Plaintiffs' stewardship of the Department, the Department received an outstanding evaluation from an independent agency hired by the School District.

47.     Other managers inside and outside the School District have frequently praised Plaintiffs for their performance.

48.     Others also have expressed disbelief at the sudden and unwarranted termination of all four Plaintiffs, and have shared their perceptions that it constituted unequal treatment based on race.

49.     Simply stated, whatever pretextual reasons the Defendants offer for their conduct, they cannot plausibly argue that Plaintiffs were unqualified for their positions.

**Plaintiffs Complained To The School District About The Discriminatory Treatment.**

50.     At the time of their terminations, all of the Plaintiffs were informed that they could apply for new positions at the School District.  These assurances later proved to be misleading, as the Plaintiffs were excluded from and not offered many positions for which they were fully qualified and more qualified than the candidates selected.

51.     They also were rejected for interviews in their old jobs in the reorganized Department, despite their undisputed qualifications and demonstrated successful performance of those duties.

52.     Within days of their terminations, Plaintiffs communicated to Mr. Andrew Rosen, Esq. and Ms. Wendy Beetlestone, Esq. of the School District their complaints that their terminations were the result of unlawful race discrimination.

53.     Subsequently, the School District made no real attempt to cure or investigate Defendants' discriminatory treatment of Plaintiffs.  Instead, Defendants used Plaintiffs' race discrimination complaints as a basis for retaliating against them in violation of Title VII and the PHRA.

54.     To this day, Defendants have never interviewed any of the Plaintiffs or sought information from them as to the basis for their complaints of race discrimination.  Thus, Defendants have completely failed to conduct a thorough and impartial investigation of Plaintiffs' complaints, contrary to the mandates of School District policy and state and federal law.

**Defendants Discriminated By Not Allowing Plaintiffs To Transfer Into Other Jobs**

55.     The School District has long had a practice of offering management employees the opportunity to transfer into comparable positions rather than simply terminating them.  This

10

is especially true with respect to employees with extended service who are not being terminated for cause, such as Plaintiffs.

56.     However, in this case, contrary to the School District's common practice, no Plaintiff was given that opportunity.  Instead, those transfers were reserved for non-Caucasian employees and/or employees who had not lodged a race discrimination complaint with the School District.

57.     Ms. Sangster made and/or participated in the decision to terminate Plaintiffs because of their race and without affording them an opportunity to transfer into comparable positions, also because of their race.

**Defendants Refused To Hire Plaintiffs Into Positions For Which They Were Qualified.**

58.     Because they were not offered the opportunity to transfer into comparable positions (like other non-Caucasian employees and employees who had not complained of race discrimination), Plaintiffs were required to apply for other positions within the School District.

59.     However, and not surprisingly, Plaintiffs were denied equal opportunity in that regard.  Plaintiffs, except for Mr. Pilosi, applied for a new position called "Procurement Services Assistant."

60.     Given their prior experience, Plaintiffs were more than qualified for that position. Nevertheless, none was even interviewed, let alone offered the job.  Instead, that position was awarded to an African-American male with no procurement experience.

61.     In fact, as the selection process for other positions progressed, the School District and Ms. Sangster made it clear that they would offer any sham or pretext to avoid interviewing or hiring Plaintiffs.

62.     For example, a posting for a position called "Procurement Manager" was closed on May 14, 2003, meaning no further applications were to be accepted beyond that date.

63.     Each Plaintiff, except Mr. Pilosi, applied for that job.

64.     Contrary to Ms. Sangster's promise that Plaintiffs would be able to apply for new positions after their terminations, on May 16, 2003, only two days after the posting was closed, Ms. Sangster wrote to Messrs. Johnston, Zubris, and Bracchi rejecting their applications for the Procurement Manager position and informing them that the position already had been filled.

65.     However, this statement was false and pretextual.  On that same day the School District informed three other employees that they should interview for the Procurement Manager job on May 22.

66.     Ms. Sangster later stated that her communication to Plaintiffs that the job had been filled was a "mistake."  She never did provide a legitimate, nondiscriminatory reason for excluding Plaintiffs from consideration for this position.

67.     Similarly, Mr. Zubris was rejected for the position of Buyer I, the most elementary buyer position in the Department and a position which Mr. Zubris himself held some 30 years ago.

**Defendants Continue Their Discrimination And Retaliation Against Mr. Johnston.**

68.     Mr. Johnston was eventually selected for another position within the School District, but at a significant pay cut and reduction in responsibilities, terms and conditions.

69.     Curiously, Mr. Johnston was told as a condition of his hiring to have no contact with anyone in the Department after receiving his new position.  Ostracizing Mr. Johnston from the Department was an unprecedented act of hostility and retaliation.

70.     Mr. Johnston applied for approximately four positions within the School District without success after he was terminated.

71.     Eventually, on or about April 28, 2003, and after a competitive selection process, he accepted a position as a Teacher Helpline Specialist, for which he was paid approximately $66,000 per year, more than $30,000 less than he was earning prior to his termination.

72.     Later, Mr. Johnston applied and was selected for the position of Administrative Assistant to the Director of Food Services for the School District.  Mr. Johnston was scheduled to assume that position on Monday August 11, 2003.

73.     However, on August 5, 2003, within days after Mr. Johnston and the other Plaintiffs filed their original Charge of Discrimination with the Equal Employment Opportunity Commission and the Pennsylvania Human Relations Commission, Mr. Paul Schmid, the Director of Food Services for the School District, phoned Mr. Johnston and told him that his new position may be "delayed," or words to that effect.

74.     Mr. Schmid informed Mr. Johnston that on or about August 1, 2003, Ms. Karen Burke, the Chief Operating Officer for the School District, told Mr. Schmid that Mr. Johnston's new position was "on hold," or words to that effect, pending release of the Greater City Schools Report.

75.     Even though Mr. Johnston had already been selected for his new position, through a fair and competitive process, Ms. Burke informed Mr. Schmid, and Mr. Schmid in turn informed Mr. Johnston, that the School District's Human Resources Department would notify him at a later date whether he would assume his new position.

76.     On August 7, 2003, Mr. Schmid phoned Mr. Johnston and asked if a representative from the School District's Human Resources Department had contacted him regarding his new position.

77.     Mr. Johnston informed Mr. Schmid that no such representative had contacted him.

78.     In response, Mr. Schmid told Mr. Johnston that Ms. Cozette Buckney (an African American female), the Executive Assistant to the Chief Executive Officer for the School District, "yelled" at him, or words to that effect, for his decision to hire Mr. Johnston into his new position.

79.     On August 8, 2003, Mr. Tomas Hanna's secretary (Mr. Hanna is the special assistant to Mr. Paul Vallas, the CEO for the School District) phoned Mr. Johnston and asked him to report to Mr. Hanna's office later that day.

80.     It is extremely unusual for a School District employee to be called to Mr. Hanna's office.

81.     Upon reporting to Mr. Hanna's office, Mr. Johnston asked Mr. Hanna if he was being fired.  Mr. Hanna told Mr. Johnston that he was not fired, but that his new position was "being withdrawn," or words to that effect, because the School District was awaiting the results of a new report.

82.     Mr. Johnston asked Mr. Hanna if he meant that Mr. Johnston might be hired at a later date.  Mr. Hanna indicated there would be no circumstances that could lead to Mr. Johnston's hiring into the position he had previously received.

83.     Accordingly, Mr. Johnston remained employed with the School District as a Teacher Helpline Specialist.

84.     At his meeting with Mr. Hanna, Mr. Johnston received a letter signed by Mr. Hanna notifying him that he would not actually assume the new position for which he had been selected.  Mr. Hanna informed Mr. Johnston that he was the only employee receiving such a letter from Mr. Hanna.

14

85.     The School District's refusal to permit Mr. Johnston to assume the position it had awarded him constituted unlawful race discrimination and retaliation.

**COUNT I**
**TITLE VII – RACE DISCRIMINATION**

86.     Plaintiffs incorporate by reference the allegations set forth in the preceding paragraphs as if fully set forth herein.

87.     Pursuant to Title VII of the Civil Rights Act of 1964, as amended ("Title VII"), it "shall be an unlawful employment practice for an employer . . . to . . . discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment because of such individual's race, color . . . or national origin."  See 42 U.S.C. 2000e-2(a)(1).

88.     The School District's acts, including the acts of its managers on behalf of the School District, as set forth above, constitute unlawful race discrimination against Plaintiffs in violation of Title VII.

89.     As a result of the aforementioned intentionally discriminatory acts of the School District, Plaintiffs have suffered and will likely continue to suffer grievous harm including, without limitation, substantial loss of income and benefits, loss of earnings potential, loss of enjoyment of life, and severe emotional distress.

**COUNT II**
**TITLE VII – RETALIATION**

90.     Plaintiffs incorporate by reference the allegations set forth in the preceding paragraphs as if fully set forth herein.

91.     Pursuant to Title VII, "it shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge,

15

testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."  See 42 U.S.C. § 2000e-3(a).

92.     The School District's acts, including the acts of its managers on behalf of the School District, as set forth above, constitute unlawful retaliation for Plaintiffs' race discrimination complaints in violation of Title VII.

93.     As a result of the aforementioned intentionally retaliatory acts of the School District, Plaintiffs have suffered and will likely continue to suffer grievous harm including, without limitation, substantial loss of income and benefits, loss of earnings potential, loss of enjoyment of life, and severe emotional distress.

**COUNT III**
**SECTION 1981– RACE DISCRIMINATION**

94.     Plaintiffs incorporate by reference the allegations set forth in the preceding paragraphs as if fully set forth herein.

95.     Pursuant to Civil Rights Act of 1866, 42 U.S.C. § 1981, ("Section 1981") it is unlawful to discriminate in contracts, including employment contracts, on the basis of race.

96.     The Defendants' acts, as set forth above, constituted willful and unlawful race discrimination, in violation of Section 1981.

97.     The Defendants' acts, as set forth above, were pursuant to a custom, policy and practice of the School District to discriminate against Caucasians and in favor of African-American employees and others in the Purchasing Department and other School District departments.

98.     This discrimination against Plaintiffs and in favor of African-Americans in the purchasing function of the School District was consistent with City of Philadelphia policy and practices espoused by top city officials who have influence and control over the School District.

99.     This discrimination against Plaintiffs was under color of state law.

100.    As a result of the aforementioned intentionally discriminatory acts of Defendants, including Ms. Sangster in her individual and official capacities, Plaintiffs have suffered and will likely continue to suffer grievous harm including, without limitation, substantial loss of income and benefits, loss of earnings potential, loss of enjoyment of life, and severe emotional distress.

**COUNT IV**
**SECTION 1981– RETALIATION**

101.    Plaintiffs incorporate by reference the allegations set forth in the preceding paragraphs as if fully set forth herein.

102.    It is unlawful to retaliate against a person for complaining about race discrimination prohibited by Section 1981.

103.    The Defendants' acts, as set forth above, constitute willful and unlawful retaliation for Plaintiffs' race discrimination complaints in violation of Section 1981.

104.    The Defendants' acts, as set forth above, were pursuant to a custom, policy and practice of the School District to retaliate against Caucasians who complain of race discrimination by Defendants.

105.    This retaliation against Plaintiffs was under color of state law.

106.    As a result of the aforementioned intentionally retaliatory acts of Defendants, including Ms. Sangster in her individual and official capacities, Plaintiffs have suffered and will likely continue to suffer grievous harm including, without limitation, substantial loss of income and benefits, loss of earnings potential, loss of enjoyment of life, and severe emotional distress.

**COUNT V**
**PHRA – DISCRIMINATION**

107.    Plaintiffs incorporate by reference the allegations set forth in the preceding paragraphs as if fully set forth herein.

108.    Under the PHRA, it is unlawful for any employer to "discharge from employment . . . or to otherwise discriminate against" any person "with respect to compensation, hire, tenure, terms, conditions or privileges of employment or contract" because of his/her race, color or national origin.  See 43 Pa. C.S. § 955(a).

109.    Defendants' intentional and willful acts of race discrimination against Plaintiffs alleged above are in violation of the PHRA.

110.    Ms. Sangster's actions and/or inactions alleged above provided substantial assistance and encouragement to the School District in its violations of Plaintiffs' rights under the PHRA.

111.    As a result of the aforementioned intentionally discriminatory acts of Defendants, Plaintiffs have suffered and will likely continue to suffer grievous harm including, without limitation, substantial loss of income and benefits, loss of earnings potential, loss of enjoyment of life, and severe emotional distress.

## COUNT VI
## PHRA – RETALIATION

112.    Plaintiffs incorporate by reference the allegations set forth in the preceding paragraphs as if fully set forth herein.

113.    Under the PHRA, it is unlawful for "any person [or] employer . . . to discriminate in any manner against any individual because such individual has opposed any practice forbidden by this act, or because such individual has made a charge, testified or assisted, in any manner, in any investigation, proceeding or hearing under this act."  See 43 Pa. C.S. § 955(d).

114.    Defendants' intentional and willful acts of retaliation against Plaintiffs for opposing Defendants' discriminatory practices alleged above are in violation of the PHRA.

115.    Ms. Sangster's actions and/or inactions alleged above provided substantial assistance and encouragement to the School District in its violations of Plaintiffs' rights under the PHRA.

116.    As a result of the aforementioned intentionally retaliatory acts of Defendants, Plaintiffs have suffered and will likely continue to suffer grievous harm including, without limitation, substantial loss of income and benefits, loss of earnings potential, loss of enjoyment of life, and severe emotional distress.

## JURY DEMAND

Plaintiffs demand a jury trial for each of their claims set forth herein.

## DEMAND FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment against Defendants:

  a.    Declaring the acts and practices complained of herein to be in violation of Title VII, the PHRA and Pennsylvania state law;

  b.    Directing Defendants to reinstate Plaintiffs to their former positions with back pay and all other benefits, increments, etc., to which they are entitled;

  c.    Permanently enjoining and restraining Defendants from violating Title VII, Section 1981 and the PHRA;

  d.    Permanently enjoining and restraining Defendants from retaliating against Plaintiffs for opposing their discriminatory practices and/or for participating in the process through which they seek to vindicate their rights under Title VII, Section 1981 and the PHRA;

  e.    Directing Defendants to take such affirmative steps as necessary to assure that the effects of the unlawful employment practices complained of herein are eliminated and not repeated;

  f.    Awarding Plaintiffs such relief as to make them whole for all lost earnings, past and future, which they have suffered and will continue to suffer as a result of Defendants' improper, discriminatory and retaliatory treatment, including without limitation, past and future lost wages, lost earnings capacity and pension and other lost benefits;

19

g.      Awarding compensatory damages for extreme emotional upset, mental anguish, humiliation, loss of life's pleasures and pain and suffering;

h.      Awarding liquidated damages;

i.      Awarding Plaintiffs the costs of this action, together with reasonable attorneys' fees;

j.      Awarding Plaintiffs their losses from any negative tax consequences that result from a payment of damages; and

k.      Granting such other and further relief as the Court deems appropriate.

**FLASTER/GREENBERG P.C.**

Dated:  October 21, 2004

By:     __/s/ MDH1783_____

Michael D. Homans
Pa. I.D. No.:  76624
Commerce Center
1810 Chapel Avenue West
Cherry Hill, NJ 08002
Phone: (856) 661-2271
Fax:    (856) 661-1919
michael.homans@flastergreenberg.com
*Attorneys for Plaintiffs, Robert Johnston, Jack Zubris, Edward Pilosi and Peter Bracchi*